# CASES IN ERROR.

MURRAY, impleaded with others, *appellant,* and BLATCH-FORD and others, *respondents.*

A release of a debt by two administrators, without the concurrence of a third administrator, is good, and the dissent of the third, forms no objection to its validity. Executors and administrators stand on the same ground; their liabilities and responsibilities, and their rights, interest and authority, over the estate of the deceased, are the same. The doctrine of *lis pendens* is not applicable to an interlocutory proceeding: as where notice was given of an intended application to the chancellor, by one of three administrators, for the suspension of the powers of the administration, and the appointment of a receiver, on the alleged grounds of the insolvency of one of the co-administrators, and the advanced age and infirmities of the other. A compromise, made by a debtor of the estate with the administrators, whose powers were thus sought to be suspended, and a release executed by such administrators after such notice, was held operative, notwithstanding such notice. An answer to a bill in chancery, charging fraud, responsive to the bill denying the charge, and uncontradicted by evidence, rebuts the idea of fraud. Persons interested in an estate, may pursue property into the hands of any person who colludes or conspires with the executor to produce a devastavit. Collusion is any intermeddling with the executor or the assests of the testator, by which the executor is guilty of a violation of his duty. A release of a debt, on a compromise with the debtor, executed by the administrators, though contrary to the wishes of one third of those entitled to distribution, will not be set aside where there is no fraud or collusion shewn between the debtor and the administrators.

APPEAL from the court of chancery. John B. Murray and John P. Mumford were partners in business, as merchants, in the city of New-York, under the firm of *Murray & Mumford,* which partnership terminated in 1806. In 1818, Mumford filed a bill in the court of chancery against Murray, claiming a large balance as due to him, and praying an account. Murray put in his answer to the bill, a replication was filed, but before publication passed, the com-

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

plainant, in 1820, died intestate, leaving a widow and six children, viz. John I. Mumford, Charles F. Mumford, Harriet, the wife of John D. Keese, Julia Ann, the wife of Richard M. Blatchford, Maria A., wife of James C. Bliss, and Caroline M., the wife of Daniel E. Dunscomb. Administration upon the estate of the intestate was granted to his widow, Mary I. Mumford, his son, John I. Mumford, and his son-in-law, Daniel E. Dunscomb, who exhibited their bill of revivor and supplement against John B. Murray, who answered to the same, and the cause was put at issue, and proofs taken. In January, 1822, a decretal order was made, requiring the defendant to account. The defendant appealed to this court, which appeal was dismissed for want of prosecution, in September, 1822. In December, 1822, the defendant obtained a re-hearing in the court of chancery, and the decretal order of the preceding January was confirmed. The defendant again appealed, and in September, 1823, the second appeal was also dismissed, for the want of prosecution. An account was then taken before a master, who, in September, 1824, reported in favor of the complainants, to the amount of about $90,000, which report was confirmed by an order entered on the 26th January, 1825.

Previous to the entry of the order for confirmation, to wit, on the 15th January, 1825, Daniel E. Dunscomb, one of the administrators, gave notice of an intended application to the chancellor on the 24th January, for the appointment of a receiver, and a suspension of the powers of the administrators, on the alleged grounds, that John I. Mumford, one of the administrators, had stopped payment and become insolvent; that Mary I. Mumford was far advanced in age, and of infirm health ; and that there were differences existing between her and him, the said Daniel E. Dunscomb, which prevented all intercourse between them, and rendered it impossible for them to concur in the duties and offices of the administration. These facts were set forth in a petition, verified by the affidavit of Dunscomb, and copies of the petition and notice were served on John B. Murray, Mary I. Mumford, and John I. Mumford. On the 20th day of January, Dunscomb, on the request of the two other administrators,

agreed to postpone the application until the 31st of the same month; and, on the same day, viz. the 20th January, Mary I. Mumford and John I. Mumford, without the assent of Dunscomb, made a compromise of the suit with the defendant, John B. Murray, accepted from him $30,000, and by an instrument under their hands and seals, released him from the decrees made in the cause, and from all claims, causes of action, matters and things mentioned or intended in the decrees, or which were or could be claimed in the cause prosecuted against him. The late chancellor *Kent* advised Mrs. Mumford to make the compromise, and was a witness to the execution of the release.

To set aside this release, a bill was filed by Richard M. Blatchford and Julia Ann, his wife, and James C. Bliss and Maria A., his wife, in July, 1825, against John B. Murray, Mary I. Mumford, John I. Mumford, Charles F. Mumford, John D. Keese and Harriet E., his wife, and D. E. Dunscomb and Caroline Matilda, his wife, charging the release to have been obtained by fraud, and by taking advantage of the necessitous circumstances of Mary I. Mumford and John I. Mumford. The defendants, in their separate answers, admit the facts stated as to the prior suit, and the compromise made between Mary I. Mumford and John I. Mumford and John B. Murray, but aver that the same was fairly made, and deny all fraud. It is deemed unnecessary to state the facts and circumstances of the case relied on by the complainants in support of the charge of fraud, as they are adverted to in the opinion of the *Chief Justice*, pronounced on the decision of the cause. The cause in chancery was brought to a hearing in December, 1827, before the Hon. JAMES EMOTT, one of the circuit judges, sitting for the chancellor, who, on the 1st February, 1828, decreed the release to be inoperative so far as regarded the rights and interests of the complainants; but, as between the parties and privies thereto, he declared the same to be valid and binding, and ordered two sixth parts of $30,000, the proportions or shares which the complainants would have been entitled to, had they consented to the settlement, to be paid back to John B. Murray, (the same having been paid into court,) and that the

complainants have leave to prosecute the original suit to a final decree, to ascertain the amount, if any, due from John B. Murray to the estate of John P. Mumford, to the end that the complainants' interest might be liquidated, and gave further directions as to costs, &c. The *defendant*, Murray, appealed from all that part of the decree adjudging the release inoperative as it regarded the rights and interests of the complainants, giving them the right to prosecute the original suit, and directing that only two sixths of $20,000 should be paid back to the defendant ; insisting, that if the release was in any respect adjudged inoperative, he ought to have been allowed to receive back the whole sum of $30,000; and the *complainants* filed a cross-appeal from that part of the decree which directs the two sixths of $20,000 to be paid back to the defendant. The cause, on the appeal of the defendant, was first moved for argument.

· The reasons for the decree in the court of chancery, appear in the following opinion, pronounced by Judge EMOTT on the decision of the cause, which, not being published in the *chancery reports*, necessarily is presented here :

The points in this cause, which I am called upon to decide, will present themselves with more clearness when a few facts, with dates, are stated.

It appears, that John P. Mumford died in November, 1820, leaving the defendant, Mary I. Mumford, his widow, and the defendants, John I. Mumford, Charles F. Mumford, Harriet Keese and Caroline Dunscomb, and the plaintiffs, Julia Blatchford and Maria Bliss, his children. Mumford having died without a will, administration of his estate was granted to the widow, Mary Mumford, the son, John Mumford, and the son-in-law, Daniel E. Dunscomb. His estate, after the payment of debts, goes in the regular course of distribution : one third to the widow, and a sixth of the remaining two thirds to each of the children.

In November, 1818, John P. Mumford filed his bill in this court against John B. Murray, who had been his former partner, in order to make him account for a large sum of money, in his capacity of partner, which he had either re-

ceived or made himself liable for. An answer was put in, but it was excepted to, and the bill was also amended. The exceptions and amendments were answered, and on farther exceptions, were again answered. Mumford died in November, 1820, and in March following, his administrators filed a supplemental bill, and bill of revivor, which being answered, proofs were taken in the cause, and chancellor Kent, in January, 1822, made a decree, by which he directed an accounting, on principles declared in the decree. An appeal was entered to this decree, by Murray, but it was dismissed for want of prosecution, in September, 1822.

In November, 1822, Murray presented a petition for a rehearing, and for liberty to file a cross bill. The bill was filed and answered, and on the rehearing, chancellor Kent, on the 21st December, 1822, after giving an elaborate and detailed opinion, confirmed his former decree, in all respects. In January, 1823, Murray again appealed, and the last appeal was also dismissed for want of prosecution, in September following.

The cause was then carried to a master, who, in September, 1824, concluded a report in favor of the plaintiffs, for upwards of $80,000, on the principles and according to the instructions of the order of reference. The report of the master is dated the 1st of September, but was not formally completed until sometime in January, thereafter. The amount, however, was known to the parties in September, and taking the decretal order of January, 1822, as establishing their rights, the sum reported is within the calculation, which could readily be made.

In the autumn of 1823, John I. Mumford, one of the administrators, failed, having in his hands something like $7,000 of moneys belonging to the estate; and for this, and other alleged causes, a petition in the cause was drawn, in the name of Dunscomb, the co-administrator, praying for the appointment of a receiver, and that the administrators might be restrained from any further exercise of their powers. The petition was prepared on the 11th of January, and, with a notice of an application to the chancellor for the 24th of January, was served on the defendants, John I. Mumford,

Mary I. Mumford, and John B. Murray. On the 20th of January, John I. Mumford and Mary I. Mumford applied to Dunscomb to postpone his application for a week, and he, consenting to such delay, gave a new notice for the 31st of January, which was served upon his co-administrators, and upon Murray. On the 20th of January, John I. Mumford and Mary I. Mumford, without the concurrence, and against the known wishes of Dunscomb, took upon themselves to settle with Murray. They compounded with him for $30,000, and on receiving that sum, gave him a release.

The object of the bill, in this cause, is to have the release set aside; and upon the argument, several grounds were taken, which I shall now proceed to consider.

The first point is, that the release was bad, as being executed by two administrators, without the other.

It is certainly true that Lord Bacon, in his tract, entitled, "The use of the Law," (title Property by Letters of Administration,) says, any one executor may convey the goods or release debts, without his companion; and any one, by himself, may do as much as all together; but it is not so with administrators, for they have but one authority given to them by the bishop, over the goods, which authority being given to many, is to be executed by all of them joined together.

And in *Hudson* v. *Hudson*, (1 *Atk.* 460,) decided in 1737, lord Hardwicke said, he was of opinion, that one administrator could not release a debt or convey an interest so as to bind the other, and that the case of an administrator differed from that of an executor. He places his opinion on the ground, that the administration is the nature of an office, and draws the consequence that the administrators must join in the execution of the acts of the office; and on this kind of reasoning, he said, the case depended. He remarked, that no case had been cited, but he had the opinion of a very great man, lord Bacon, which seemed to correspond with his, as to the nature of the different rights of executors and administrators. All this, however, was a mere speculation on the part of his lordship, as the cause did not turn on this point, and the release, in that particular case, was held good at law, but was set aside in chancery, as having been unfairly obtained.

On the other hand, we have the Touchstone, which in page 462, after saying that all the executors are, in the eye of the law, but as one man, and that most acts done by or to any one of them, are esteemed as acts done by or to all of them, adds, but how the law is of administrators, *quere;* for some think, that one of them may sell goods and release debts without the other. And Comyn, in his Digest, says, that if there are several executors or administrators, they have a joint and entire interest in all the goods of the testa- tor, which cannot be divided; and that, therefore, a release of a debt by one, is good for all. (1 *Com. Dig.* 342.) It is true, that Comyn refers to the marginal notes in Dyer, which, as having been made by Lord Chief Justice Treby, are consider- ed of great weight and authority, and which speaks only of executors; but the Digest is equally strong to show, that in the opinion of Chief Baron Comyn, the case of an administra- tor does not differ from that of an executor.

In 1751, we have the case of *Jacomb* v. *Harwood,* (2 *Ves.* 265,) in the very court in which Lord Hardwicke continued to preside, where we find Sir John Strange, the master of the rolls, saying, I never knew it questioned, in case of executors, that each executor has the entire control of the personal estate of the testator, may release or pay a debt, or transfer any part of the testator's property, without the concurrence of the other executor. It has, indeed, been questioned in case of administrators, whether one administrator had such a power equal to that of an executor, and the attempt has been made to distinguish that from the case of executors; and though, in *Hudson* v. *Hudson,* it was said that the lord chancellor had been of opinion that one administrator could not release so as to bind the other, yet when that case was more narrowly looked into, it appeared clearly, that it was applicable to the particular circumstances of the case. But after that, was *Willand* v. *Fenn,* where it was held in B. R. after three arguments, that one administrator stood on the same ground or foundation with one executor. Toller, in his Law of Executors, 408, after citing the cases of *Hudson* v. *Hudson,* and *Willand* v. *Fenn,* says, it seems to be now set-

VOL. I.    75

tled, that a joint administrator stands on the same footing, and is invested with the same powers, as a co-executor. And Chief Justice Kent, in delivering the opinion of the court in *Douglass* v. *Satterlee*, (11 *Johns. R.* 22,) declares that it is well settled, that each executor has the control of the estate, and may release, pay, or transfer, without the agency of the other; and that executors and administrators stand on the same ground, and their powers and responsibilities in respect to each other, are the same.

Resting on authority, there is no difficulty in arriving at the conclusion that the release by the two administrators is good in law. If the cases left any room to doubt, on this subject, the reason of the thing, as well as the necessity of the case at this day, would lead to the same result. Lord Bacon's notion, that the administrators had a mere authority which was to be jointly exercised, was probably taken from the doctrines and practice of the ecclesiastical courts, at a time when the administrator was the creature of the ordinary, acting by his will and substantially for his benefit. The letter of administration was then considered as a power of attorney, giving no interest, and to be strictly pursued. But since the statutes designating the persons entitled to administration, and directing distribution to the next of kin, letters of administration have changed their character. They come now, growing out of and regulated as they are by statute, in the place of a will. They are, in truth, the last will of the deceased, as made by law, and adopted by him. Now, when administration may be granted to all the next of kin, or to several persons having claims on the estate, and may therefore include many individuals residing at different and distant places, to require them all to join in the acts of the administration, would produce great inconvenience, delay, and expense, without any fair object to be obtained. Administrators, now, as well as executors, are mere agents to settle the estate; their charges and duties are the same; and for the benefit of the estate and of their trust, their powers should be the same.

It has been urged, however, that admitting the release of one administrator to be good, when there is the mere want of

assent of the other, yet the actual and known dissent of the co-administrator will render it inoperative. For this distinction no authority was cited, and I am not aware of any case that gives countenance to it, nor has it any foundation in the reason of the thing. The power of each administrator, in law, is full and entire, and though he acts at his peril, and subject to an accounting, yet what he does, stands good in law, unless fraud is shown, which will invalidate every transaction.

The next point made was, that the two administrators who signed the release, acted in their own wrong, and breach of trust ; and Murray, knowing this, was a party to the wrong, and ought not to be allowed to set it up for his own advantage.

It is alleged that the settlement amounts to a devastavit, inasmuch as it was the taking of a sum, not only much below what had always been claimed as due by the parties releasing, but scarcely a third of the sum reported by the master. It can scarcely be contended that every transaction, which in law could create a devastavit, by the administrator would go to charge the person dealing with him. The sale of property below its value, would be a devastavit, and yet if the sale was without fraud, the title would certainly be good. It is said, too, that if he arbitrates, and an award is given for less than is due, this also creates a devastavit, for the difference ; but the award must, notwithstanding, be good, to limit the claim and discharge the debt. If, as the lord chancellor says, in *Crane* v. *Drake*, (2 *Vern.* 616,) the defendant was a party, and consenting to, and contriving a devastavit, it would be relieved against in equity. Thus, in *Noell* v. *Robinson*, (1 *Vern.* 455,) the chancellor said, if an executor should release a debt of £100 for 1s. that would not bind a creditor. But in all these cases, the court will have to decide under all the circumstances, not only, that there has been a plain devastavit on the part of the executor, but that the debtor consented to, and was a party in contriving the devastavit ; then indeed, a case of fraud is made out, which the long arm of the court will reach. In a case where the executor acts in good faith, but under a wrong impression as

to the amount of the demand, or the circumstances of the debtor, a mistake may possibly, according to the old authorities, make him liable for a devastavit, which would have been known to the debtor, as best acquainted with the sum due, and his situation to respond to it; but if he acted fairly, making merely the best bargain he could, without resorting to deception or malpractice, the settlement, as to him, would be valid, unless there was very great and apparent inequality.

In this case, I am not prepared to pronounce on the devastavit. It is true, I have before me the master's report, and cannot but see that it accords with the decisions of the chancellor. All this, however, does not establish the demand. The amount may be varied in this court; and, as the whole cause is one of controversy, the order here may be annulled in the court of appeals. I might form an opinion by reading the pleadings and proofs; but this I hardly dare do, as it would, without argument, be an attempt to revise the judgment of the chancellor, given after much discussion and consideration. I would rather act on the opinion which he gave the parties on the settlement. He advised it, certainly not to create a devastavit, or to countenance fraud.

If a devastavit can be made out, I am not prepared to say, that Murray contrived it, or that he came into the settlement with a belief that he was doing wrong to the estate. In his answer, he states, that the sum he gave was much more than what he considered as due, and that he gave it to purchase peace, and to rid himself of a long, expensive and vexatious controversy; and he expressly avers, that he was advised by counsel, there was error in the decree, and that he intended to carry the cause to the court of errors. I cannot, therefore, say, that there has been waste in the administration, or if there was, that Murray was a party to it.

The next point in the cause, is, that the service of the petition for a receiver operated as a *lis pendens* upon the settlement, so as to make the release invalid, as against non-concurring parties. Something is said in the bill, and was much urged on the argument, as to the attempt to evade the opinion and directions of the court. The court will certainly take care, that its process, orders and decrees are duly res-

pected ; but I do not feel that it ought to be so sensitive as to consider a settlement, made after a mere notice of an application, as a contempt, or as deserving much reprehension.  If the parties were willing and desirous of making a fair and honest settlement, and believed that they would be embarrassed by waiting until an order was made on the petition, the court ought not to consider itself offended by the settlement.

The doctrine of *lis pendens* is as well explained and qualified by Lord Bacon's 12th rule, as in any of the decisions. This declares, that no decree bindeth any that cometh in *bona fide*, by conveyance from the defendant, before the bill is exhibited, and is made no party by bill or order.  But when he comes in *pendente lite*, and while the suit is in full prosecution, and without any color of allowance or privity of the court, there regularly the decree bindeth.  But if there were any intermissions of suit, or the court made acquainted with the conveyance, the court is to give order upon the special matter, according to justice.

In *Metcalf* v. *Pulvenloft*, (2 *Ves. & Bea.* 204,) Sir Thomas Plummer, vice-chancellor, speaking of the *lis pendens*, says, it is presumptive, if not actual notice ; and the purchaser is in the same situation in which the vendor stood, upon this same principle, that the suit is to be decided according to the state of things when it was instituted, and the rights, however they may be varied by death, bankruptcy, &c. cannot be affected by the voluntary act of either party.  This is the principle running through all the cases, both at law and in equity.  In a real action, notwithstanding a conveyance pending the suit, the defendant is treated, with reference to the execution, as if he remained a party.  So upon a writ of *mesne*, the judgment in the real action will overreach an alienation pending the suit.  The authorities establish this proposition : that alienation of the defendant, for the purpose of that cause, has no effect as against the plaintiff, who is entitled to proceed as if no such title existed.

We have thus the rule and its reason.  It is intended to keep the subject matter of the suit clear of any embarrassment, by the voluntary act of the parties, while the suit is in progress ; and when applied with caution, and a due regard

to the rights of innocent and unoffending persons, it is a most necessary and salutary rule. Without such rule, the parties, by creating new interests, would control the justice of the cause, and render litigation interminable and most oppressive. But this rule, in terms, applies only to strangers to the cause, warning them, at their peril, to keep out of its vortex. The parties are not forbid by it to act as between themselves ; and if fears are entertained by co-plaintiffs or co-defendants, that their rights or their interests are about to be infringed or invaded by their associates, they may obtain the protection of the court, on a proper case, made by order or injunction, but most certainly not by any attempt, like the present, to create a *lis pendens*.

The remaining point, on the part of the plaintiffs, is, that the settlement and release, being collusive and fraudulent, were utterly void. If fraud is made out, the court will certainly lay its hands on the release ; but then it must be fraud on the part of Murray. If the other parties to the settlement and release have acted unwisely or unfairly, it may subject them to a charge for a devastavit ; but unless Murray joined in the fraud, he will, as for this cause, be entitled to hold the release. A short recurrence to the pleadings and proofs will now be necessary, to see how far actual fraud has been brought home to Murray.

The bill, in its details of the proceedings in the former suit, and of the appeals therein, means to give to the defence the character of unfairness and oppression. The part of the defence which required explanation most, I think has received it, both in the answer of Murray and in the argument—I mean the appeals taken, and their dismissal for want of prosecution. Murray says, that both appeals were entered in good faith, and not for the purpose of delay. He alleges, that it was his intention that the first appeal should have been argued when called, and he employed counsel for that purpose. His counsel, he says, suffered the appeal to be dismissed in consequence of their coming to the conclusion that certain evidence in the possession of the plaintiff should be produced, and that it was advisable that a re-hearing should be applied for, in order to enable him to compel the

production of such evidence. Murray also says, it was his intention to have brought the second appeal to a hearing, but that his counsel, shortly before the appeal was called on, advised him, for the first ime, to suffer it to be dismissed, because the error which they said existed in the decrees, would be made more apparent after the taking of the accounts, and that 'the accounts would serve greatly to elucidate the real merits of the controversy. This, in the absence of all proof of the contrary, accounts satisfactorily for the manner in which these appeals were disposed of, as far forth as Murray had any agency in them. He had to act by counsel, and is certainly to be justified for allowing them to conduct the appeals according to their judgment.

In order to establish the fraud in the settlement, the plaintiffs, after stating that John I. Mumford had recently failed, and that Mary I. Mumford was old, infirm and unfit to attend to business, and that the arrangement was made with bad faith, and in violation of the duty of the administrators, and was intended to defeat the petition for a receiver, alleges that Murray had long contemplated a secret compromise with the two administrators, which he intended to carry into effect, when circumstances should put it in his power. The bill also avers, that the sum received was very far short of the sum due, and was so known to be by Murray ; and it contains other statements and allegations, which make every part of the answers of all the defendants fairly responsive to the bill.

Murray, in his answer, says, that he was always desirous of making a final settlement of the matter in dispute, but he never watched for an opportunity to draw the Mumfords into any secret arrangement, and that he never made any endeavors to induce them to come to any settlement or compromise with him, prior to the time of the final negotiation ; and that, at such time, he used no unfair, unlawful or improper endeavors to effect or induce them to come into the arrangement ; and that the negotiation and settlement were, in all respects, fair and *bona fide*, and without any unfair or unlawful design or intent of any sort, on his part, or, as he believes, on the part of the Mumfords. He says, that he made an offer of $30,000 in September, 1823, but it was not accepted ; and that the negotiation for a compromise

which had been broken off for a great length of time was renewed by the Mumfords, or one of their friends, shortly before the final settlement.   On the 20th of January, 1825, the settlement was negotiated and concluded, and he gave $30,000, which was a much larger sum than was in justice and equity due, and much more than Mumford ever pretended to claim, although he was fully acquainted with all his rights in the cause.   He says, no privacy was practiced on his part, in negotiating the compromise, and avers that he was advised by his counsel, and believes, that the decrees would have been reversed, and it was well understood, by all concerned, that he intended to appeal after the taking of the account.

These answers are direct and explicit, and leave no room for cavil or reasonable criticism ; and, unless they are contradicted by the testimony, or shaken by the circumstances appearing in the case, they must put at rest the charge of actual fraud, as to Murray.   I am not aware that any witness has been examined who ever saw or communicated with Murray, or that any one act of his in relation to the settlement appears, but from his answer.   He introduced no witness to prove his motives or his conduct in the transaction, nor was it necessary that he should.   He had a right to stand on his answer, until it was attempted to be disproved ; nor can I feel the force of the argument that endeavored to discredit the answer, because Murray did not support it by the testimony of his agent, who conducted the settlement, in order that he might be cross-examined.   If the testimony of James B. Murray was deemed of importance by the plaintiffs, they might have called for him, and it is not pretended that he would not have been forthcoming.

The circumstances which have been dwelt upon, as showing actual fraud in Murray, notwithstanding its denial in the answer, are, the inadequacy of the sum paid, and the preparation of the release by the solicitor of Murray, and its terms—a word or two as to each.   The sum paid was certainly very far short of that reported, but it no where appears that Murray ever recognized a liability equal even to the sum in the compromise ; and on the contrary, we have

his oath, that such amount was greatly beyond what was due in equity or justice. Even were it less, Murray had the right of every man in a controversy, to make the best terms for himself he could, so that he acted fairly. Inadequacy of price may mark a transaction as fraudulent, but then it ought to be gross and plain. This is not such a case.

As to the preparation and terms of the release, they do not seem to press very hard. Murray had been for a long time defending himself against a claim which put at hazard his whole property, and finally concluded to adjust it, by paying a very large sum. It was proper that he should take great care to close the controversy effectually, and it was quite natural that he should select his own counsel to settle the terms of the release. It is objected to the release, that it recites, " that it was for the interest of the estate, and that Murray had threatened a further appeal." Now this, after all, was the foundation of the settlement. If no appeal were apprehended, then the taking of $30,000 for $90,000, could not have been justified; and if the administrators had not deemed the settlement for the interest of the estate, then they ought not, and this court may say, could not, have gone into it. But it is said, the release is over-cautious in having a covenant on the part of the administrators, that there should be an order in the cause, dismissing the bill. To my mind, however, such covenant was fair and proper. The great object of the settlement was the ending of the protracted and expensive controversy, and it would have been idle for Murray to have parted with his money, without a security against the claim and the suit.

Without dwelling longer on this part of the case, I may say that I am satisfied that actual fraud has not been made out against Murray. It is not, perhaps, necessary that we should examine into the fraud charged upon the Mumfords, and not brought home to Murray; but as great stress has been laid upon this fraud, it may be well to examine whether it has been established. Now, although it is easily understood, that an aged female and an insolvent son might have been entrapped by a wealthy and sagacious and watchful opponent, yet the motives which could lead the Mumfords to

commit a fraud, in order to injure the plaintiffs, their near relatives, who had been connected with them in carrying on the suit, but which was to fall most heavily on themselves, is not easily discerned ; for after all, the two administrators, acting for themselves, and with the consent and for Charles Mumford and Mrs. Keese, had an interest to the amount of two-thirds of the whole claim.    To establish actual fraud against persons thus circumstanced, the proof must be plain and positive.

First, then, as to Mrs. Mumford.   In her answer, she states, that a few days before the release was executed, she was informed by John I. Mumford, that if a majority of the administrators would assent to it, $30,000 might be received of Murray.   She expressed her assent to the settlement, as did Mr. and Mrs. Keese and Charles, upon being consulted.   Her assent was given in good faith, and from a full belief that the true interest of those concerned in the estate, required that such settlement should take place, in preference to pursuing a protracted litigation ; taking into consideration, also, the difficulty of obtaining from Murray the amount of a heavy decree, in case he was disposed to conceal his property.   She avers, that no secret application was made to her by Murray, nor were any arguments or inducements addressed to her by him to compromise, and that the settlement was made in good faith, and with a view to promote the true interest of the estate, and not secretly or fraudulently ; and she alleges, that she did not consider it as her duty to communicate the intended settlement to the plaintiffs or to Dunscomb, as it was considered advantageous to the estate, and they were known to be opposed to the same, and it was moreover supposed that they might attempt to prevent the settlement, and create difficulty or delay in carrying the same into effect.

The answer certainly shows great anxiety on the part of Mrs. Mumford to close with the proposition made to her by her son and co-administrator, but it shows nothing more.   It meets and negatives the charge of fraud, and I mistake the testimony in the cause very much indeed, if it does not establish, that she acted in the utmost good faith, and with a firm persuasion that she was doing what was best for her family.

That she should be anxious to close the controversy, by receiving a large sum, is easily conceived. She is called in the bill, an aged female, and is said to be dependant on her family for support, and looking to this claim as the only thing left her by her husband. Her son-in-law, Dunscomb, was hostile to her, and without meaning to lift the veil which conceals the disagreements of this family, I think, he gathered, from what appears in this cause, that she was not on friendly terms with the plaintiffs. Of her sons, one had failed, and the other was engaged in fitting himself for business. The suit had lasted for nearly seven years, and she had probably heard of bills and answers, and exceptions, and references, and reports, and appeals, until she was satisfied, that if she was to wait for aid from this source, her eyes would close on the litigation unfinished, and which was to be to her only productive of care and contentions in her own family. The settlement made a provision for her for life, and perhaps she might say to herself, that the difference between $30,000, the sum she received, and $40,000, which, it seems, would not have been objected to by the plaintiffs, differed her upwards of $3,000, while it only affected the plaintiffs to the amount of about $1,000 each.

No witness was produced by Mrs. Mumford; and of the witnesses introduced by the complainants, the only one who testified to any thing material, was the late chancellor Kent. Mr. Clizbe details some conversations he had with her; but they are without point, and lead to no results.

It would seem, as well from the bill as from the argument, that the plaintiffs believe that fraud is to be inferred from the fact, that the Mumfords applied to chancellor Kent for his friendly advice in relation to the settlement and release; and his opinion and his name, it is said, were to be procured, to prevent any opposition to the settlement. But who were to be influenced by such opinion? Not surely the plaintiffs; they had their counsel, and knew their rights, and were not to be driven from their course by the legal opinion of any man. On the court? This will not be pretended, as we are to pass on the facts as they appear in the cause; and yet, if the chancellor's name is not to control the one or the oth-

ALBANY,
Dec. 1828.

Murray
v.
Blatchford,

er, it is difficult to conjecture how fraud is to be connected with it. In truth, an undue importance has been given by the plaintiffs to the part taken in the settlement by the chancellor. There was, and there could be, nothing wrong in the application to him. The controversy had its birth in this court, and grew to maturity during the time he presided here ; and the claim, if enforced to the extent contended for by the plaintiffs, must rest on his decrees, and the investigation he has so frequently and so ably given to the facts and the law of the case. Who, then, could be better fitted to advise with ? And ought fraud to be inferred from the fact that Mrs. Mumford, in the divisions of her family, sought the counsel and direction of a person so pre-eminently qualified to guide her ? Chancellor Kent says, that he understood, at the time Mrs. *Mumford and John I. Mumford* wished to be guided by his advice, that he told Mrs. Mumford, if she was his mother, he would advise her to execute the release ; and he might have added, if it was his own case, he would do the same himself. The reasons he gives for his advice are, that he believed Murray would carry the cause to the court of errors ; and from his experience in that court, he had reason to apprehend some uncertainty as to the cause in the court of errors, inasmuch as he had found himself grievously mistaken in the cause of Riggs and Murray ; that he considered Mrs. Mumford as a feeble woman, and unable to endure a protracted and expensive litigation ; and he had some apprehension that Murray might not be able to pay the decree as it stood.

But it is said, that there was fraud in the application to chancellor Kent, inasmuch as the Mumfords did not communicate to him that they were acting in the settlement without the consent and against the wishes of Dunscomb, their co-administrator, and that the standing counsel in the cause had not been consulted. As the counsel did not appear in the settlement, and the release was drawn by the adverse counsel, and passed upon by the chancellor, he must have inferred at the time, although it has now escaped his recollection, that the counsel in the cause took no part in the settlement. That Dunscomb took no part in the settlement, appeared

from the paper itself. He is named in the title of the cause, as one of the administrators; but in the release which succeeds it, his name is omitted, while those of the Mumfords are inserted, as agreeing to the compromise, receiving the money, and giving the discharge. As Dunscomb resided in New-York, the paper itself contained sufficient notice that Dunscomb not only did not join in the settlement, but was hostile to it. Be this as it may, this information was not necessary for the opinion which was asked, as the advice sought for, was merely whether the sum offered by Murray ought, under all circumstances, to be accepted by the estate; and the silence of the Mumfords on these topics was neither fraudulent nor material.

As to John I. Mumford, he denies that the settlement was negotiated or concluded secretly or fraudulently, and alleges, that so far as he was concerned, and, according to his belief, so far as the other parties thereto were concerned, the same was done in good faith, and without any fraud, collusion, or improper views whatever, but for the purpose of promoting the true interests of the estate, and of the parties interested therein. He admits the compromise was made without the consent or knowledge of the plaintiffs or of Dunscomb, and contrary to their judgment or desire, as to the amount to be received; but he alleges they were willing to compromise on receiving a larger sum. He is not, however, apprised of the amount they required.

John D. Keese, in his answer, says, that the first intimation he received of the compromise was about two days before the release was signed, when the Mumfords stated to him that the preliminaries of a compromise had been agreed upon, and that it only waited for the assent of himself and his wife; he assented in good faith, and from a full conviction that the true interests of the estate and of the parties interested therein, required that such settlement should take place, in preference to continuing an expensive litigation. In agreeing to the settlement, the parties assenting thereto, in conversing on the subject, took into consideration the difficulty of obtaining from Murray the amount of the final decree, in case he was disposed to cover his property. He de-

nies that the settlement was negotiated and concluded secretly and fraudulently, but says that the same was done in good faith, and with a view to promote the true interest of the estate.

Charles Mumford, in his answer, says, that two or three days before the release was executed, being in Philadelphia, he received a letter from his brother, stating that endeavors were making to effect a compromise with Murray, and requesting his consent thereto. He gave for answer, by the return mail, that he would agree to any compromise which the administrators, or a majority of them, might make; and this is the only communication he had on the subject of the settlement.

The only witness in the cause besides those whose testimony has already been adverted to, was George Griswold, who was introduced by the plaintiffs, with intent to impeach the answer and conduct of John I. Mumford. This witness, however, says, that Mumford, when he informed him of the settlement, declared that he had not received any of the money himself, for he had told his mother, beforehand, that he would not receive any of it, but that she and the rest might take care of it. The impression of the witness was, that the compromise and settlement were made in preference to contending in controversy to the end of the law. This testimony certainly does not look to fraud, and it leaves the answers as it found them. Without going farther into the cause, I feel warranted in saying, that the plaintiffs have failed in making out their charge of actual fraud against any of the defendants. Then comes the grave question, whether the plaintiffs, under all the circumstances of the case, are to be held bound in this court by a settlement and release which was made and given without their concurrence, and against their known wishes.

That there are cases in which the persons entitled to the personal estate may be relieved against the acts of the executor, and a debtor or creditor, will be seen by a recurrence to a few authorities. Thus, in *Newland* v. *Champion*, (1 *Ves.* 106,) lord Hardwicke says, if there are any persons who have possessed the estate, or any debtors of the deceased,

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

and any collusion between them and the representative, they may here, though not at law, follow the assets and make them parties, and demand an account against them ; but this is not to be done until there is some proof of collusion.

In *Scott* v. *Tyler*, (2 *Dick.* 712,) certain bonds were pledged by the executor, to secure not only a private debt of his own, but also future advances to him in his private trade. The bill was by the legatee against the pawnee. The bonds were specifically bequeathed, and there was ample funds to pay debts, so that the executor was bound to assent to the legacy. Three years after the death of the testator, the defendants, who were bankers, took the bonds without any reference to the affairs of the testator. No actual fraud was pretended, and the bankers swore that they knew nothing of the bonds until they were deposited as a general security, and they had no knowledge of the contents of the will. (2 *Bro. Ch. Cas.* 476 and 479.) Lord Thurlow said, this must proceed on the ground of imputing fraud to the pawnee, in concerting with the executor a devastavit and misapplication of the testator's effects, to disappoint the specific legatee. He remarked, that fraud and covin will vitiate any transaction, and turn it to a mere color. If one concerts with an executor or legatee, by obtaining the testator's effects at a nominal price, or at a fraudulent undervalue, or by applying the real value to the purchase of other subjects for his own behoof, or in extinguishing the private debt of the executor, *or in any other manner*, contrary to the duty of the office of executor, such concert will involve the seeming purchaser, or his pawnee, and make him liable for the full value. He decreed that the bonds should be delivered up. The words "or in any other manner," lord Eldon, who had been counsel in the cause, says, in *M'Leod* v. *Drummond*, (17 *Ves.* 167,) were very material.

In *Doran* v. *Simpson*, (4 *Ves.* 664,) lord Eldon says, that in the case of a creditor, or of next of kin, if they can state a case that the representative is colluding with the debtors to the estate, and diminishing the fund, they have a right, on the ground of collusion, to make the debtor a party to obtain a discovery, and upon that discovery, to attach upon the mo-

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

ney, and to prevent the payment of the money, or a settle-ment of the account, by collusion between the representa-tive and the debtor. And referring to the case of *Newland* v. *Champion*, he says the authority of lord Harwicke in that case, had been supported by a vast number of cases where it has been necessary for a party interested, either as credit-or, or as being entitled to a distributive share of the person-al estate, not to permit the administration to go on abusively or collusively between the representative and a person who is indebted to the estate.

In *Alsager* v. *Johnson*, (4 *Ves.* 217, 6 *Ves.* 748,) it ap-peared that an action at law was commenced against execu-tors by an attorney for the testator ; the residuary legatees applied to the executors to be permitted to defend, which was refused ; a verdict was had, and under it the prothono-tary awarded a large sum as due. The legatees filed their bill against the plaintiff in the action, and the executors im-peaching the demand and charging collusion, the legatees were relieved, although there does not appear to have been proof of a fraudulent collusion. Lord Eldon, in deciding the case, says, with respect to collusion, it is very difficult to de-fine what it is; it must depend on all the circumstances ; and where a creditor seeks to appropriate to himself the ad-vantage arising from the too great facilities the executors may have given him to substantiate his demand, or too great readiness in admitting it, the case, as against a creditor, be-fore it can be said there is not collusion, must be examined with very nice and critical attention ; and he adds, there is sufficiently grave evidence in this case to make the court hes-itate long before it would say, there is not that which this court would not deem collusion between these parties. His lordship said, he inclined to think a decree might be made against the creditor, on the ground that, whether there was a debt due, and to what extent, had never been tried with that searching attention which the legatees had a right to expect from the executors.

These cases go to show that the personal representatives are not, in all cases, bound by settlements made with debtors by the executor, although there was not actual fraud. I

think that if a settlement plainly appears to have been for the benefit of the estate, it will be held binding on the personal representative, although it was made without his concurrence, or even against his consent ; nor perhaps would a settlement be opened where the amount in controversy was small, and the renewed litigation would lead to great trouble and expense. But without speculating about cases where the courts might or might not interfere, it is sufficient for the present, and for this cause, to say, that the court, without fixing on any general rule or principle, will determine every case according to its particular circumstances.

As it is not pretended that Mumford left debts to any amount, this claim has been prosecuted for the benefit of the personal representatives ; and the administrators are therefore emphatically their trustees and agents. The cause is carried on until the result in this court is no longer a matter of doubt, and then, at a moment when the administrators find that their agency and power are about to be transferred to other hands, they go hastily into a compromise without consulting the representatives now before the court as plaintiffs in this cause, and avowedly because it was understood by all the parties that such representatives would not consent to the terms offered. The sum reported is very large ; and that taken, is about a third of the amount. The settlement was made on the grounds of the uncertainty of the result of a threatened appeal to the court of errors, and the fear that Murray might cover his property. These are considerations which I cannot judicially weigh, nor can I say that the settlement was beneficial to the estate ; and I am therefore constrained to say, but without imputing actual fraud, or believing that the parties were actuated by improper motives, that the settlement and release do not, in this court, bind the plaintiffs in this cause, and they are therefore to be at liberty to prosecute the claim and the former suit, so far as their rights are concerned. With respect to the other parties, as well the representatives of Mumford as Murray, I shall hold them bound by the release. The representatives of Mumford, it is understood, do not object to this ; and as Murray

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

acted in this business with a full knowledge of the rights and wishes of all the family, he assumed, of course, all the risk which attended the settlement. It shall therefore bind him as far forth as he had the assent of the family, and where such assent fails him, he shall be placed in the state in which the settlement found him.

A few words on the subject of costs. It is urged, on the part of John D. Keese and his wife, and Charles F. Mumford, that they were improperly made defendants, and that therefore they ought to have costs allowed to them. As the nature and extent of the interest of these defendants appeared on the face of the bill, the short and cheap way of bringing the question before the court would have been by demurrer; (7 *Ves.* 287;) and although it is not too late at the hearing upon the answers and testimony to have it passed on, the court will not, without urgent cause, then dismiss the bill with costs. But I think if these defendants were not strictly necessary parties, and of this I do not feel that I am called upon to give an opinion, still that there was nothing improper in putting them in the cause. The general rule is, that all persons who are either legally or beneficially interested in the subject matter and result of the suit, ought to be parties, so that a complete decree may be made. Now it is evident that the defendants had an interest in the original claim, as well as in the sum in court, and had therefore a right to be heard, either for or against the settlement. Indeed, the decree made must necessarily reach and conclude them, and the court could not well pass upon their interest without having them before it as parties.

As to the general costs, it is material that the settlement was not brought about, or the release obtained, by fraud on the part of Murray. He certainly was aware that the plaintiffs were not acting in, or consenting to, the compromise; but there is no evidence that he took advantage of the old age of the mother, or the necessities of the son, to obtain undue terms. On the contrary, it appears that the Mumfords, without any agency on the part of Murray, first moved in the settlement; and I am satisfied that Murray thought he was buying his peace, by paying the full extent of what he

believed was due to the estate of Mumford. I shall not, there-
fore, order him to pay costs.

. The cause was argued by *R. Sedgwick* and *S. A. Talcott,*
(attorney general,) for the appellant, and by *H. W. Warner*
and *D. B. Ogden,* for the respondents.

ALBANY,<br>Dec. 1829.<br><br>Murray<br>v.<br>Blatchford.

*R. Sedgwick,* for appellant. The complainants were bound
to shew, either that the settlement between Mary I. Mumford
and John I. Mumford and John B. Murray was void, as un-
authorized and made without authority, or that it was fraud-
ulent in fact. As to the question of fraud, it is fully denied
by the answers, and the charge not being supported by the
testimony of two witnesses, or by one witness and corroborat-
ing circumstances, it falls to the ground. His honor, the cir-
cuit judge, who sat for the chancellor in this case, decided ev-
ery question in favor of the defendant, and yet, by an extraor-
dinary deduction of the human mind, he decreed against him.

Two of the administrators of the estate of John P. Mum-
ford, had the power and right to make the settlement in ques-
tion, and to give a release in full to the appellant. The right
of one of several *executors,* to release a debt or chose in ac-
tion, is unquestioned; and the only doubt which can exist,
whether one of several administrators has not the same pow-
er, arises from an opinion of Lord Bacon, in his tract enti-
tled, "The Use of the Law," that the authority conferred
upon administrators, must be executed by all of them joined
together. This opinion has been pronounced wrong, both
in England and in this country. (1 *Com. Dig.* 342. *Jacomb*
v. *Harwood,* 2 *Vesey,* 265. *Toller,* 408. *Douglass* v. *Satter-
lee,* 11 *Johns. R.* 22.) The principle that executors and ad-
ministrators stand on the same ground, and that their pow-
ers and responsibilities in respect to each other are the same,
is alike supported by authority and the reason of the thing.
Both are officers. The executor is appointed by the testa-
tor—the administrator by law: the latter is required to give
security for the faithful discharge of his duties; the for- .
ner, being selected by the testator himself, no abuse is an-

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

ticipated, and therefore no security is required from him. To shew what was held to be the law on this subject previous to the dictum of Lord Bacon, the counsel cited 2 *Vernon*, 514, *Rastall*, 560, and note of an opinion of Lord *Talbot*, in 1 *Atkyns*, 460.

The power of the administrators was not suspended by the petition for a receiver. A bare notice of an intention to apply to the chancellor for such suspension, could not operate as an injunction. The filing of a bill would not have such effect. If the petition was sufficient to avoid the compromise, it would equally have avoided a settlement by the payment of the whole amount reported; and had the appellant paid the full amount after notice of the intended application, can there be a question that he could not have been compelled to make a second payment? On a bill filed against a trustee, praying an injunction against the disposition of the trust property, and that a receiver be appointed, a purchaser, though held chargeable with notice of the pendency of the suit, and of all the facts stated in the bill, was protected in the payment of a *sum of money to the trustee*, because the trustee, by any thing contained in the bill, was not deprived of the power of receiving payment from, and discharging the debtors of the trust estate. (4 *Johns. Ch. R.* 38. See also 1 *Johns. Ch. R.* 26, 60, 573, 155.)

As to the question of fraud. The inquiry in this case is, whether there was *moral*, not *legal* fraud; was there a fraudulent intent in the parties, which consists in *mala fides*? An executor or administrator can act fraudulently only in two ways: Where he improperly favors a debtor of the estate, or where he seeks to enrich himself, at the expense of the estate; neither of which can be pretended in this case. The principle advanced by the circuit judge, that each case is to depend upon its peculiar circumstances, cannot be correct. A sound discretion, based upon well settled legal and equitable principles, may be exercised; but none of the land-marks of the law are to be disturbed. Even in questions of inadequacy of price, there are certain fixed rules to govern the discretion of courts. The judge expressed the opinion, that actual fraud had not been established against the appellant, and yet

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

he set aside the release, as it regarded the interests of two of the children of the intestate, on the authority of the cases of 1 *Ves.* 106 ; 2 *Dick.* 712, 724 ; 2 *Bro. Ch. C.* 476, 479 ; 9 *Ves.* 464, 217 ; 6 *Ves.* 748. Those cases proceed on the ground of collusion in the representative. Collusion always has a sinister aspect, and is rather difficult to be distinguished from fraud. If an executor or administrator has power to release a debt, he necessarily has a discretion in the management of the concerns of the estate. If such discretion is not allowed, no compromise can be made by him, however much the interests of the estate may require it. Whilst he acts within the bounds of common honesty, his acts will be supported. The compromise cannot be set aside on the ground of its being a hard bargain. To enittle a party to rellef on that ground, it must be so hard and unconscientious as to shock the moral sense and excite astonishment. That is not this case ; for although a report of a master had been made for $90,000, it had not been confirmed. The appellant intended to appeal, and the widow was advised by counsel, most able to give advice in this matter, to effect the compromise. The judge in his decree, has adopted a middle course, confirming the settlement in part and avoiding it in part. This cannot be correct. $30,000 was paid to put an end to the controversy. If that must be continued, the appellant is entitled to a return of his money.

*H. W. Warner*, for respondents. The release, being executed by two of the administrators, without the concurrence, and contrary to the will of the third administrator, is bad. Lord Bacon, in his law tract, "Use of the Law," (title, property by letters of administration,) says, that any one executor may convey the goods or release debts without his companion, and any one by himself may do as much as all together ; but it is not so with administrators, for they have but one authority given to them by the bishop over the goods, which authority, being given to many, it is to be executed by all of them joined together. In *Hudson* v. *Hudson*, (1 *Atk.* 460,) decided in 1737, Lord Hardwicke said, he was of opinion that one administrator could not release a debt or con-

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

vey an interest, so as to bind the other, and that the case of an administrator differed from that of an executor. He placed his opinion upon the ground that the administration is in the nature of an office, and draws the consequence that administrators must join in the execution of the acts of the office. Sundry elementary works of the highest respectability, lay down the rule of law as stated by Lord Bacon. (2 *Black. Comm.* 510. *Wood's Institutes*, 335. *Toller's Law of Executors*, 187, 324. See also, 1 *Viner's Abr.* 78, tit. *Executors, D.* 2. *Talbot's Cases*, 127. 2 *Vernon*, 514. 1 *Bridgman's Index, pl.* 21. 4 *Mass. R.* 636.) Opposed to this current of authority, is the *Touchstone*, (*p.* 462,) where a quere is introduced as to the application of the law relating to executors to the office of administrators; for some think, says the author, that one of them may sell goods and release debts without the other. Comyn refers to a case which speaks only of executors. *Jacomb* v. *Harwood* was a case of executors, and what was said as to administrators is *obiter.* The case of *Willand* v. *Fenn*, referred to in the last case, is found no where else. At all events, it only decides that one administrator stands on the same ground or foundation with one executor. This may be true in some particulars, but it does not shew that the point now in controversy was there litigated. In the case of *Douglass* v. *Satterlee*, the question was as to the liability of one administrator for the acts of another. What was said by the late chief justice on the subject of the powers of administrators over the estate of the intestate, was uncalled for, and besides, rests for its authority on the case of *Jacomb* v. *Harwood*. There should be a distinction in the rule, as it relates to the powers of executors and administrators. Administration is in the nature of an office. It is created by public authority, springing from policy and necessity. When, therefore, several are named, *all* must join in performing the office and administering the law. Not so with executors. They are appointed by the testator; and although he names several, the confidence he has reposed must not be limited. They are his confidential, selected friends, and it is to be presumed, that to each individually he is willing to entrust the management of his estate. The powers and responsibil-

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

ities of an executor and administrator are not the same. The power of an administrator cannot be transmitted. The executor may act without probate; the administrator must take an oath and give bond. If an executor becomes reduced in his circumstances, the law will not deprive him of his trust. If an administrator fails, a receiver is appointed.

The transaction relative to the release, was rendered improper and unlawful, by the pendency of the petition for a receiver. *Lis pendens* is a rule of constructive notice, and therefore strictly applied; but when actual notice is given, no hardship can be complained of. The rule applies when the proceedings are regularly commenced. The application, of which notice was given, was a regular proceeding, and in the ordinary course of practice. The parties in interest gave notice to the appellant virtually not to pay to the administrators. Is a powerless *cestui que trust*, who does all he can to save his interests, not to be protected? Shall it be permitted to a stranger to deal with the trustee, and destroy the *cestui que trust*, after notice? The notice was given by Dunscomb, but the complainants are entitled to protection, although their rights were prosecuted in the name of another. It was in the nature of an application for an injunction, of which being apprized, Murray is bound to account again. The release was a breach of trust in the administrators. A release of a debt for less than its value is a *devastavit*. (*Bacon's Abr. tit. Exrs. and Admrs. L.* 431. 2 *Johns. C.* 376. 7 *Johns. R.* 404. 2 *Cowen*, 808.) A compromise must not only be in good faith, but beneficial. (3 *P. Wms.* 381. 2 *Munford's R.* 105. 9 *Mass. R.* 352.)

The release is void for fraud both in law and fact. Lord Hardwicke, in *Chesterfield* v. *Jansen*, (2 *Ves.* 185,) enumerates four species of fraud: 1. Fraud arising from facts and circumstances of imposition; 2. Fraud apparent from the intrinsic value and subject of the bargain itself; 3. That which may be presumed from the circumstances and condition of the parties contracting—and this goes farther than the rule of law, which is, that fraud must be proved, not presumed; but it is wisely established in this court, to prevent taking surreptitious advantage of the weakness or necessity

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

of another, which knowingly to do, is equally against con-
science, as to take advantage of his ignorance ; 4. A fourth
kind of fraud, his lordship observes, may be collected or en-
forced in the consideration of a court of equity, from the na-
ture and circumstances of the transaction, as being an impo-
sition and deceit on the other persons, not parties to the fraud-
ulent agreement.   This is not, as it is said, a classification of
the evidence, but an enumeration of the several species of
fraud.   The learned judge who made the decree in this cause,
is more distinguished for his profound knowledge of the com-
mon law, than of chancery law ; and he seems to have disre-
garded all those rules which prevail in a court of equity for
the detection of fraud, which do not obtain in a court of law,
and because *actual fraud* was not proved, he came to the con-
clusion that there was no fraud in the case.   The cases cited
by the judge, in support of his decree, it is agreed with the
counsel for the appellant, are cases of fraud, though not of
*actual fraud ;* and the seeming contradiction in the views of
the judge on this subject, may be traced to the not discrimi-
nating between the various species of fraud.

The counsel here went into a full and elaborate examina-
tion of the evidence in the case to support the charge of fraud.

*D. B. Ogden,* on same side, insisted that the release was
not binding, because executed without the concurrence, and
against the will of one of the administrators, and against the
will of three of the *cestuis que trust.*   There were no debts
shewn to be owing by the estate.   The administrators, there-
fore, had no interest in the estate.   They were merely trus-
tees for the persons interested, for whose benefit the suit was
prosecuted.   Can it be allowable that a majority should con-
trol their co-trustee, and contrary to the wishes of the par-
ties in interest, discharge a debt ?   Allowing, as a general
rule, that one of several administrators may execute a release,
does it follow that he has a right to do so, when the other
expressly dissents ?   Has he a right to give a release of a debt
without receiving payment ?   Can he release a debt which
is in a course of litigation, contrary to the wishes of his co-
administrator ?   The administrators were trustees merely to

carry on the suit against the appellant: their release, therefore, without the consent of the *cestuis que trust,* was a palpable breach of trust. If the principle of *lis pendens* does not apply to this case, where the appellant avowed that he effected the settlement to prevent the interference of the court, it can apply in no case whatever. The counsel then remarked upon the facts and circumstances relied on in support of the charge of fraud.

*S. A. Talcott,* (attorney general,) in reply. The counsel for the respondents have cited a number of authorities to support the position advanced by Lord Bacon, that the release of a debt by one of several administrators is not good, and that the authority given, is to be executed by all of them joined together. The first is 11 *Viner,* 73, *tit. Executors, D.* 2. This case only determines that the release of one administrator cannot prejudice another. The object must have been to charge the administrator with a devastavit ; because, in a court of common law, the court must have considered the release good, otherwise the question could not have arisen. The case referred to in *Viner,* is not to be found in the book quoted ; and in 1 *Burr.* 364, *Foster,* J. declares that *Viner* is no authority. *Wood's Institute,* 335, only repeats what lord Bacon had said. In 1 *Schoale's & Le Froy's R.* 369, it is said that *Blackstone's Commentaries* are no authority. What *Toller* stated in pages 187 and 324, he retracted in page 408 of his work, where, speaking of the cases of *Hudson* v. *Hudson* and *Willand* v. *Fenn,* he says, it seems to be now settled, that a joint administrator stands on the same footing, and is invested with the same powers as a co-executor. *Bridgman,* in his index, cites *Hudson* v. *Hudson,* for the purpose of shewing that an administrator may do many acts. In *Hudson* v. *Hudson,* (1 *Atk.* 460,) lord Hardwicke unnecessarily said, that one administrator could not release a debt or convey an interest, so as to bind the other. The question was not before him, because he decided that the release in that case, was not the release of an administrator, but of a creditor ; the administrators having constituted the debtors their attornies to collect debts, in which

character they had become indebted, and were afterwards re-leased by one of the administrators, and the release was set aside as fraudulent.    In 2 *Wooddeson's Lectures*, 362, the au-thority of *Atkyns* is very much questioned.    On the other hand, *Comyn* has been said to be himself an authority. · *Ja-comb* v. *Harwood*, (2 *Ves.* 265,) was decided by *Sir John Strange*, the master of the rolls, in the very court in which lord *Hardwicke* continued to preside, who said, that though in *Hudson* v. *Hudson* the lord chancellor had been of opinion that one administrator could not release so as to bind the oth-er, yet, when that case was more narrowly looked into, it ap-peared clearly that it was applicable to the particular circum-stances of the case.    It was said by the counsel opposed, that *Willand* and *Fenn* was not to be found in the books.    It may be found in 2 *Wheaton's Selwyn*, 574, *n.* 8, and in *Sheppard's Touchstone*, 484, 5, where it is cited with approbation.    Next comes the case of *Douglass* v. *Satterlee*, (11 *Johns. R.* 22,) in which it is said by the late chief justice *Kent*, that executors and administrators stand on the same ground, and their pow-ers and responsibilities in respect to each other, are the same. The same principle had been before advanced by C. J. Kent, in *Piersons* v. *Hooker*, (3 *Johns. R.* 70,) on a question of dis-charge by one partner.    The same doctrine is found in 1 *Hay-wood*, 104 ; and *Gwillim*, in a note to *Bacon's Abr. tit. Exr. & Admr. p.* 395, considers the case of *Willand* and *Fenn* as over-ruling *Hudson* v. *Hudson*.

Lord *Hardwicke*, in *Hudson* v. *Hudson*, considered adminis-tration in the nature of an office.    If a grant of an office be to A. B. without adding the word successor, it does not survive. (*Salk.* 465.  11 *Co.* 3, *b.*  *Comyn's Dig. tit. Officer, D.* 4.)  If one administrator dies, the right of administration survives. (2 *Vern.* 514.)   Shewing it survives, · it is not an office, and destroys the foundation of his lordship's argument, that if an office is granted to two, they must join in executing the acts of the office.   Nor is it a naked power, because if so it would not survive : it is a power coupled with an interest, survives, and may be executed by one.

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

The notice of the intended application for the appointment of a receiver, is not in the nature of a *lis pendens*, so as to avoid the settlement. It is not a *lis pendens*, because not a proceeding in court. A bare notice of an intended proceeding, cannot have that effect. In *Green* v. *Slayter*, (4 *Johns. Ch. R.* 38,) the true doctrine upon this subject is laid down, that no preliminary proceedings will operate as an injunction. The petition in this case was not for an injunction against a compromise, but for the appointment of a receiver for the preservation of the fund. In answer to the suggestion that here was *actual notice*, the notice did not specify any right claimed. A notice from an assignee of the transfer of the cause of action, would have been operative.

It was said, that allowing administrators to stand upon the same ground as executors, two administrators cannot release a debt if a third dissents. In *Cottrell's Transactions of the High Court of Chancery*, 87, (*Bacon* v. *Bell*,) it is adjudged, that one executor may release, though the other dissents. One executor or administrator may release too, without receiving the debt. 6 *Vesey*, 748, fully admits the principle, as the court interferes with the executor only in case of fraud. Applications for leave to compromise, are made to protect the executor or administrator ; not to authorize a compromise : that authority he always has at the hazard of subjecting himself to an action for a devastavit ; for the old and strict rule of law is, that an administrator cannot release a debt without being responsible for it. (7 *Johns. R.* 411.) In equity it is not so, if he acts in good faith ; but if liable for a *devastavit*, it shews the debt is discharged, otherwise no devastavit would be committed ; and the debtor cannot be called on a second time for payment after a release, except in cases of fraud. There is no distinction between legal and moral fraud. Fraud is an intent of the heart to do some injury collusively to the person, property, or character of another. The distinctions are only as to the modes of proof; and so the supreme court have decided in *Bissell* v. *Hopkins*, (3 *Cowen*, 166.) Whether in this case there was fraud or not, depends upon the circumstances of the case. In 7 *Taunton*, 421, it is said, where one of two executors gives a

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

release, and it is attempted to be set aside on the ground of fraud, a very strong case must be shewn. Here the defendants unite in denying the charge of fraud, and there is no evidence to impeach the answers. If the decree is set aside in part, it must be set aside in whole, as the consideration of the settlement, viz. the putting an end to the controversy, will have failed.

SAVAGE, Chief Justice of the Supreme Court. The complainants contended, in the court of chancery, that the release should be set aside, on several grounds : 1. Because it was executed by only two of the administrators"; 2. Because there was a *lis pendens* in consequence of the notice of the application for the appointment of a receiver ; 3. And principally because the transaction was fraudulent. Judge EMOTT, who sat for the chancellor, decided all these points in favor of the defendants, but held that this was a case in which the complainants ought not to be bound by the acts of the administrators ; and therefore decreed, that the release be set aside, so far as relates to the interests of the complainants who represent one third part of the estate of John P. Mumford, deceased. From this decision, John B. Murray has appealed to this court ; and the questions to be decided, are the same as in the court of chancery.

1. Was it competent for two administrators, against the will of the third, to execute a valid release ?

The law, as to the power of executors, seems never to have been questioned. " If a man appoints several executors, they are esteemed in law but as one person representing the testator, and therefore the acts done by any one of them, which relate either to the delivery, gift, sale, payment, possession, or release of the testator's goods, are deemed the acts of all ; for they have a joint and entire authority." (3 *Bacon's Abr. Exrs. & Admrs. D.*) The reason given for this rule by lord Hardwicke is, that each executor is considered as entirely representing the testator. (*Hudson* v. *Hudson,* 1 *Atk.* 460.) Lord Hardwicke, however, considered that administrators have no such power ; and the principal reason assigned for the difference is, that the executor receives his

ALBANY,
Dec. 1828.

Murray
v.
Blatchford,

power from the testator, and may perform many acts before probate of the will; but the administrator receives all his authority from the ordinary. Lord Hardwicke cites no authority but the opinion of lord *Baron*, (4 *Elements of the Law*, p. 83.)

A similar dictum is found in 11 *Viner*, 73, citing *Tothil*, 264, 5. The same point is laid down by *Blackstone*, (2 *Com.* 510,) and he relies on the case of *Hudson* v. *Hudson*. In that case, this point was not necessary to be adjudicated, as the cause was decided upon another point. The opinions, however, of lord Bacon and lord Hardwicke, are entitled to great respect; and in the English courts they have been so treated. The case of *Hudson* v. *Hudson*, was decided in 1737. In 1751, in *Jacomb* v. *Harwood*, (2 *Ves.* 267,) the same question was discussed by sir John Strange, master of the rolls, when the case of *Hudson* v. *Hudson* was considered. Speaking of that case, he says, it was said that in that case, the lord chancellor had been of opinion that one administrator could not release, so as to bind the other; yet when that case was more narrowly looked into, it appeared clearly that was applicable to the particular circumstances of the case. He then cites the case of *Willand* v. *Fenn*, in which there had been three arguments in the king's bench, and thereupon decided, that one administrator stood on the same ground and foundation as one executor; and such was the decision of the master of the rolls. The case of *Jacomb* v. *Harwood* has never been overruled in England, but has been acquiesced in, and considered as settling the point. (*Toller's Exr.* 407, 8.) And the same has been the understanding of the courts in this state. (11 *Johns. R.* 22.) The difference heretofore supposed to exist between the powers of executors and administrators, in this respect, was said to be founded in the different sources from which their powers were derived; the one being by appointment of the testator, the other by the appointment of law. I apprehend there never was any reason for the supposed distinction. Their liabilities and responsibilities were ever the same, and their powers should be so. But if there was ground formerly for it, there surely is none under our statutes, which recognize both as possessing

ALBANY,
Dec. 1828.

Murray
v.
Blatchford.

the same rights, and interest, and authority over the estate of the deceased.

2. The doctrine of *lis pendens* is this : That whoever purchases the subject matter of a suit, *pendente lite*, takes his purchase subject to. the decree or judgment which may be rendered in such suit, and the pendency of such suit is *per se* notice to all the world, and such pendency, when in chancery, commences with the service of the subpœna. (1 *Johns. Ch. R.* 576.) I apprehend this doctrine is not applicable to this case. A suit is not considered to be pending within this rule, until the service of process. In chancery, no subpœna issues until bill filed ; and the court is supposed, by awarding process, to have adjudged that the plaintiff had shewn a *prima facie* case for relief. In this case, notice had been given by one of the administrators to the other two, that an application would be made for the appointment of a receiver—not because there had been any improper conduct in the administrators, or because any thing of that kind was alleged—but because one was said to be old, and the other insolvent, and they had given security in only $40,000. This notice can never operate as a *lis pendens*. It is a mere interlocutory proceeding in the suit already pending ; and if this notice were to incapacitate the administrators from acting, it would be easy for a *cestui que trust,* by giving a similar notice, to prevent executors or administrators, or trustees, from ever doing any thing, and there would be no safety in transacting business with them. A reference to the offices of any of the officers of the courts, would give no information of any such *lis pendens*. Not even an *ex parte* adjudication of the matter gives sanction to the claim ; but simply the mere assertion of a right to interfere, by the person giving the notice. It is conceded in this case, that the defendants had notice of the intended motion, and they acted in reference to such notice, and, it is presumed, with knowledge that such notice could have no possible effect upon any fair and equitable arrangement which they should make.

The main question in this case, I apprehend, is the question of fraud. The bill charges, that the defendants acted fraudulently, in bad faith ; and in relation to the defendant Mur-

ray, several facts are charged, as evidence of the fraud. Among these are, 1. Attempts to delay a decision in the cause, by appeal to this court. He twice appealed, and at each time, suffered the appeal to be dismissed. This is admitted, but the defendant Murray declares, that the appeals were brought *bona fide*, with an intention to have them argued and decided by this court, but that his counsel advised to the course which was adopted. This is an answer which ought to be satisfactory. The counsel, after the appeal brought, were of opinion, that after certain other steps should have been taken in the cause, the errors, which they advised their client existed, would be more apparent. The answer is given under oath, is responsive to the bill, and is not contradicted. It must, therefore, be taken to be true, and if true, rebuts the idea of fraud.

2. That Murray procured the release for much less than the report, to which he did not except, and that he was able to pay the whole sum reported due. This fact is conceded to be so; but Murray avers that the amount paid is much more than was really due, and much more than John P. Mumford, in his life time, ever claimed, though he was fully apprized of his rights.

3. It is also alleged, that the same sum had been previously offered, and rejected. To this, it is answered, that two years previous the same sum was offered; that an arrangement was partially made by the counsel in the cause for a settlement for $35,000; and that $30,000 would have been received, provided the defendant Murray would have paid the costs; and that at the time when the arrangement was made, $40,000 would have been assented to by all the parties in interest.

It appears that there existed in the family of Mrs. Mumford an unfortunate family difficulty, insomuch that it was unpleasant for her and Dunscomb to transact business together. So Dunscomb says; but Mrs. Mumford denies that they could not associate for the transaction of necessary business.

4. It is urged as evidence of fraud, that the settlement was made without consulting Dunscomb or the complainants.

The answer is, the family quarrel already stated ; but that in fact the consent of Dunscomb was requested by John I. Mumford, previous to the execution of the release.

5. It is also charged, that Murray had been long endeavoring to circumvent Mrs. Mumford and John I. Mumford, and to take advantage of their situation, both being in necessitous circumstances, and Mrs. M. moreover, being old and infirm. The intention imputed to Murray, he denies. He knew that Mrs. M. was poor, and that J. I. M. was insolvent; but it is to be recollected, that the same offer was made when these circumstances did not exist, and he made no attempt to obtain more favorable terms than he had before proposed. In answer to the charge, that Mrs. M. was old and infirm, it is denied, except that she was sixty years old and upwards. This is indeed an age which is supposed to disqualify certain persons for the performance of certain public duties; but the presumption of incompetency, I believe, does not extend to the transaction of private concerns; but if so, still Mrs. M. in this respect, had the vantage ground of Murray, who, from facts appearing in the case, must be presumed to be several years in advance of her. But the fact of age is not urged as a ground to support the charge of fraud in Mrs. Mumford. It were, indeed, a melancholy spectacle to see persons, far advanced in life, active participators in fraudulent practices, or even the dupes of others, when the natural presumption should be, that as we approach the end of our course, probity and integrity should be predominant, that we may be better prepared to answer the charges to be made against us in that dreadful day of awful responsibility and account which we are rapidly approaching.

6. It is also charged as one of the fraudulent devices resorted to by the defendants, that the late chancellor Kent was consulted in relation to the settlement, and his advice in favor of it fraudulently obtained.

Of all facts adduced to support a charge of fraud, this is, to my mind, one of the most extraordinary. That the chancellor, who had known the whole history of this case, who had established the principle upon which the defendant, Mur-

ray, was to account, who had presided in our courts for a longer period than any other citizen in the state, and who, during all that time, held a most distinguished rank, should be incapable of giving correct and wholsome advice, without consulting the counsel in the cause, is a paradox incapable of explanation. It seems to me, therefore, as it did to the learned judge who decided this cause in the court below, that the charges of fraud have been successfully refuted.

One other circumstance appearing on the part of the defendants is worthy of notice. The persons entitled to the estate of John P. Mumford are, the widow Mary I. Mumford and six children, three of whom were in favor of the settlement, and three against it. The widow being entitled to one third of the avails of the suit, those concurring in the settlement, represent two thirds of the subject in controversy. If they conspired and confederated to cheat any body, it was to cheat themselves twice as much as they cheated the complainants, which is a palpable absurdity. And, in relation to this point, it should be recollected, that before any examination before the master, Murray made the same offer; and $5000, or at most $10,000, in addition then, and even when the settlement was made, would have been accepted by those who now seek to set aside the release. Of this additional sum, two thirds would have gone into the pockets of the defendants, and but one third to the complainants—less than $1000 to each—a sum which it seems to me could be no equivalent to the mortification resulting from the fact of presenting upon the records of the court a charge of a fraudulent attempt by a mother to defraud her own daughters. When to all these considerations is added, what no doubt had a controlling influence, the determination of Murray to appeal, and the possibility that even less than the $30,000 might ultimately be recovered after a protracted litigation; and further, that Mrs. M. was advised to this course by a counsellor, than whom no one could be more capable of giving advice, so far from seeing, in this transaction, evidence of fraud, it would have been extraordinary if the offer had not been accepted.

Thus far I have concurred in the views of the learned judge who made the decision in the court of chancery. In the eloquent opinion which we have before us, it is shewn very satisfactorily to my mind, that the acts of two administrators stand on the same ground as two executors ; and the dissent of the third administrator, forms no objection to the validity of the release ; that it is in no way affected by the doctrine of a *lis pendens,* and that fraud is not imputable to any of the parties to the release. Yet, he decreed that it should be held inoperative and void as to the complainants in this cause, who are two of the children of John P. Mumford not assenting to the settlement and release. This decision is not placed upon any particular principle, but upon the circumstances of the case : the amount of the report, compared with the amount received ; the compromise carried into effect, when the motion was about to be made to supersede the powers of the administrators ; the uncertainty of the result of an appeal ; the possibility of an entire loss of whatever might ultimately be awarded to the estate ; and the impossibility of deciding whether the settlement was advantageous to the estate. It is certainly true, that there are cases where those interested in an estate are permitted to pursue it into the hands of any person who colludes or conspires with the executor to produce a devastavit. It becomes my duty to examine this subject in the cause of *Colt* v. *Gilbert, adm'r, &c.,* decided in this court one year ago, but which is not yet reported, and to review several of the cases referred to in the opinion of the circuit judge. In the case of *Colt* v. *Gilbert,* the facts were, that Jabob Le Roy was executor of the last will and testament of Dulary ; that, as such executor, he had in his hands a considerable sum of money which belonged to the estate, and which money was used as part of the capital of the house of Jacob Le Roy and son ; and that Colt, one of the firm, transferred the money of the estate of Dulary to Colt, by Le Roy's direction, as he said, in payment of a debt due him by the firm. In that case, we held that the house of Le Roy and son, and of course Mr. Colt, one of that firm, was responsible to the administrator, with the will annexed, and to the residuary legatee, for the amount of the estate thus mis-

applied; and after referring to the leading cases on the sub- ALBANY,
ject, we came to this conclusion : "That any person receiv- Dec. 1828.
ing from an executor the assets of his testator, knowing that Murray
such disposition of them is a violation of his duty, is to be ad- v.
judged conniving with the executor; and is responsible for Blatchford.
the property thus received, either as a purchaser or a pled-
gee." And the principles laid down by Ch. Kent, in *Field*
v. *Schieffelin*, (7 *Johns. Ch. R.* 150,) were approved : that the
purchaser is safe if he is not a party to the fraud of the ex-
ecutor, and has no knowledge or proof that the executor in-
tended to misapply the proceeds, or was, in fact, by the very
transaction, applying them to the extinguishment of his own
private debt; that in such case, he buys at his peril; but
that if he has no such proof or knowledge, he is not bound to
inquire into the state of the trust, because he has no means to
support the inquiry, and he may safely repose on the gene-
ral presumption, that the executor is in the due exercise of
his trust.

This decision, and the principles established in it, seem to
me to bring us back again to the question of fraud and collu-
sion. All the cases cited by the circuit judge, are, I appre-
hend, cases of fraud or collusion. Lord Eldon seemed to be
at a loss to determine what collusion is. We have defined
it to be any intermeddling with the executor, or the assets of
the testator, by which the executor is guilty of a violation of
his duty; so that we are brought round again to the question
whether the administrators were guilty of a violation of duty,
under all the circumstances of the case, and which need not
be again recapitulated.

It is true, they released for one third of the sum reported
in their favor; but it is also true that, according to the ans-
wer of Murray, (and this answer must be considered true,)
the sum paid was more than was really due, or was ever
claimed by Mr. Mumford, in his lifetime. It must also be
understood, that Murray did not intend to submit to this re-
port, but was about to appeal; and the chancellor, who
knew all the facts and the law of the case, advised to the ac-
ceptance of the terms offered. It is idle to suggest, that
fraud was practiced on such a man. Can it be supposed,

that he was incapable of giving an opinion upon a case which he had adjudged, without the opinion of counsel? I would by no means depreciate the services of counsel; but it is a mistake to suppose that no one but the counsel employed in a cause is capable of forming a correct opinion as to its probable results, or of giving suitable advice as to its progress or termination.

It is also true, that the persons claiming one third of the avails, were opposed to the settlement, but the administrators, and those interested in the residue, were in favor of it. Suppose the administrators had no interest in the avails, and those owning two thirds of the fund had urged such an arrangement, but it was declined, and in the end much less had been recovered; or suppose the whole had been lost, through the *subsequent failure of Murray, after rejecting such an offer;* would not those who had urged the settlement have much more reason to call upon the administrators and charge them with a violation of duty?

In addition to these considerations, when it is stated as a fact in the case, that a sum in addition, but less than $1000, to each of the complainants, would have been accepted by them, though less than half the sum reported, and this known to the administrators, I am free to express my opinion, that to have refused the offer of $30,000, would have been highly indiscreet, if not a positive violation of duty; and that their termination of the controversy was prudent and proper.

I am therefore of opinion, that the administrators were not guilty of any violation of duty—of course, Murray could be guilty of no collusion; and therefore the complainants would have no right to pursue even assets in the hands of a *bona fide* purchaser. But another consideration of some weight is this: that in this instance, the claim in question cannot be considered assets for any greater amount than the sum agreed upon.

The result of my conclusions is, that the judge erred in setting aside the release as to two sixths of the demand in question; and that the decree should be reversed, and that the bill of the complainants should be dismissed, with costs.

ALBANY,
Dec. 1828.

SUTHERLAND, J. expressed his concurrence in the opinion pronounced by the Chief Justice, and BENTON, CRARY, ELSWORTH, ENOS, HAGER, LAKE, McMARTIN, OLIVER, SMITH, TODD, THROOP, TYSEN, WARREN and WILKESON, *Senators*, also concurred. DAYAN, McCARTY, McMICHAEL, SCHENCK, STEBBINS, WHEELER and WOODWARD, *Senators*, were of opinion that the decree ought to be affirmed.

Whereupon, a decree was entered reversing the decree in the court of chancery; declaring the release executed by Mary I. Mumford and John I. Mumford to John B. Murray, valid and binding upon the representatives of John P. Mumford, deceased; ordering the bill of the respondents to be dismissed with costs, and directing the respondents to pay the costs of the appellants in this court; and that the cause be remitted to the court of chancery, to the end that the decree of this court may be carried into effect.

It being suggested that the appellant had died since the hearing of the appeal, it was ordered, that the decree be entered with reference to the time of hearing on the 14th day of June last, so as to take effect from that day.